# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

|                                              |   |                                    |
|----------------------------------------------|---|------------------------------------|
| **ABIGAIL HERNANDEZ,**                       | ) |                                    |
|                                              | ) | **Case No: 15 c 6101**             |
| **Plaintiff,**                               | ) |                                    |
|                                              | ) |                                    |
| **v.**                                       | ) | **Magistrate Judge Susan E. Cox**  |
|                                              | ) |                                    |
| **CAROLYN W. COLVIN, Acting**                | ) |                                    |
| **Commissioner of Social Security,**         | ) |                                    |
|                                              | ) |                                    |
| **Defendant.**                               | ) |                                    |
|                                              | ) |                                    |

## ORDER

Plaintiff Abigail Hernandez appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). For the reasons discussed more fully below, we remand this matter for further proceedings consistent with this opinion. Plaintiff's motion for summary judgment is granted [dkt. 14], and the Commissioner's motion [dkt. 21] is denied.

## STATEMENT OF FACTS

## I. PROCEDURAL HISTORY

Plaintiff filed an application for Supplemental Security Income on March 5, 2012, alleging she became disabled on January 1, 2010, due to memory loss, depression, HIV, and hepatitis C. R. 133-137, 151. At that time, she was nearly 40 years old. R. 133. She left school after the ninth grade and has almost no work history, having last worked very briefly when she was 21. R. 56-57, 141-144. Plaintiff's application was denied initially and on reconsideration, and she requested an administrative hearing. R. 88-89, 94-102, 103. On January 30, 2014, an administrative law judge ("ALJ") held a hearing at which the plaintiff appeared and testified, and was represented by counsel.

R. 50-97. In addition, Julie Lynn Bowes testified as a vocational expert ("VE"). R. 50.

On April 14, 2014, the ALJ issued a decision denying plaintiff's application for SSI. R. 31-45. The ALJ determined that plaintiff was not disabled because she retained the capacity to perform a limited range of sedentary work that involved no more than simple, routine, repetitive tasks; did not require more than brief, superficial interaction with the public, co-workers, or supervisors; and involved no more than minor changes in the work environment. R. 36. Relying on the VE's testimony, the ALJ found that this allowed plaintiff to perform jobs like document preparer, addresser, and circuit board assembler, that exist in significant numbers in the national economy. R. 44-45. After the Appeals Council denied plaintiff's request for review, plaintiff filed suit in the Northern District of Illinois, seeking review of the decision under 42 U.S.C. §405(g).

## II. THE MEDICAL RECORD

Plaintiff was apparently first diagnosed with HIV/AIDS in 2004, but did not begin treatment until 2008. R. 202, 280. An infectious disease treatment note from Dr. Jose Bolanos, dated October 16, 2008, indicates that plaintiff's genotype was resistant to treatment with both nucleoside reverse transcriptase inhibitors and non-nucleoside reverse transcriptase inhibitors. R. 214. He also noted that she suffered from HIV-induced lymphadenopathy and amenorrhea. R. 214. She was an alcoholic who was drinking 40 ounces of beer a day, and a heroine addict who was undergoing methadone treatment. R. 214. She had been losing weight and had a number of other health issues, including hepatitis C. R. 214. Two weeks later, Dr. Bolanos reported that he planned to start plaintiff on an HIV medication regimen of Kaletra and Truvada. R. 206, 218. Plaintiff continued fairly regular follow-ups with her HIV/AIDS treatment. As such, a large portion of the record consists of blood chemistry and lab results. These tests, while for the most part unamplified by any doctor's

interpretation, always show plaintiff's CD4 or T-cell counts to be very low, often less that 100. R. 285, 287, 292, 300, 335, 534, 604-661.[1]

In November 2008, plaintiff reported feeling depressed, fatigued, and weak. R. 234. She had memory and concentration problems and lacked motivation. R. 234. Plaintiff claimed she had not had a drink in 6 months. R. 235. Diagnosis was dysthmia, rule/out major depression; plaintiff was assigned a GAF score of 50. R. 236.

Plaintiff missed two or three follow-up appointments in the winter of 2008-2009. R. 265. As of February 12, 2009, she was taking Methadone, Bactrim, Wellbutrin, Truvada, Reyataz, Norvir, and Aldara. R. 255.

On April 9, 2009, plaintiff had a consultative psychiatric examination in connection with a previous application for SSI. Plaintiff reported that she had last had a drink 6 months earlier and had last used heroin a year earlier. R. 250. She said she was "too weak to work." R. 250. Dr. Myrtle Mason reported that plaintiff exhibited some lack of general knowledge and a low average intelligence. R. 252. Plaintiff's judgement seemed intact, but plaintiff had difficulty with abstract thinking. R. 252. Her memory was somewhat impaired. R. 252. Dr. Mason diagnosed plaintiff with depressive disorder, substance abuse disorder, opiate dependence, and alcohol abuse. R. 252. She assigned a GAF score of 60. R. 252.

The medical record does not pick up again until April 2012, in conjunction with plaintiff's current application. On April 6 2012, plaintiff had another consultative psychiatric examination, this time with Dr. Ana Gil. R. 351-355. Dr. Gil noted that plaintiff had a history of chronic alcohol

---

[1] A CD4 cell count gives an indication of the health of the immune system. The CD4 cell count of a person who does not have HIV can be anything between 500 and 1500, while someone living with HIV who has a CD4 count over 500 is usually in pretty good health. However, those with a CD4 cell count below 200 are at significant risk of developing serious illnesses. http://www.aidsmap.com/CD4-cell-counts/page/1044596/.

dependence and last drank the day before the exam. R. 354. Plaintiff explained that she drank to quell her depression. R. 351. The doctor also noted that plaintiff was a recovering opiate addict and was receiving 140 mg. of methadone, and had been diagnosed with HIV. R. 354. R. 354. Dr. Gil reported that plaintiff had mild psychomotor retardation, a sad and restricted affect, and moderately depressed mood. R. 354. Plaintiff's immediate memory and fund of knowledge were impaired. R. 354. Dr. Gil diagnosed plaintiff with moderately severe depressive disorder. R. 355. She did not think plaintiff was capable of handling her own funds if she received benefits. R. 355.

At a mammogram appointment on April 16, 2012, plaintiff reported using heroin. R. 690. A lesion/hematoma on her left breast was the result of either injecting the drug, or being struck by her boyfriend. R. 588. The lesion was benign. R. 368. Women's clinic notes from April 2012 through November 2012 revealed plaintiff to be going through a number of problems, including severe cervical dysplasia, hepatitis infection, and condyloma. R. 564, 565, 568. The doctor noted that plaintiff had not been compliant with treatment. R. 568. Thereafter, plaintiff missed a number of HIV follow-up appointments from the end of April through the end of July 2012. R. 538, 540, 542, 544.       On April 25, 2012, Ronald Havens, Ph.D., reviewed the plaintiff's medical file from a psychological perspective, on behalf of the state disability agency. Dr. Havens noted diagnoses of depression and heroin and alcohol abuse and dependence. R. 387, 392. He thought that plaintiff would have difficulty with detailed assignments, but she could understand and remember well enough to engage in simple assignments. R. 400. Although moderately limited in maintaining concentration, persistence, and pace, she could concentrate and persist adequately enough to perform repetitive, routine tasks. R. 394, 400. She could interact appropriately with others during brief and superficial contacts and could accept criticism from a supervisor. R. 400. Plaintiff could adjust to

minor routine changes in a routine work environment. R. 400.

On May 18, 2012, Dr. Victoria Dow reviewed plaintiff's medical file as it pertained to her physical condition for the state disability agency. Dr. Dow felt that plaintiff could lift or carry 10 pounds occasionally and less than 10 pounds frequently; stand or walk at least 2 hours in an 8 hour workday; sit about 6 hours in an 8 hour workday; push or pull without limitation other than those for lifting or carrying. R. 403. She could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, and could occasionally stoop, kneel, crouch, and crawl. R. 404.

At her October 2012 appointment, the attending physician reported that plaintiff continued to have "major issues" complying with treatment and was missing doses regularly. R. 510. Plaintiff claimed that she was only drinking every other day, and this allowed her to be more compliant with her medication regimen. R. 510. The doctor had "the same conversation with her as always about the dangers of non-compliance." R. 510. She missed 2 of her next 3 appointments. R. 505, 508. By December, plaintiff was back to drinking every day, but had cut down to 3 beers. R. 502. She missed her January and February 2013 appointments. R. 496, 498.

On January 4, 2013, Lionel Hudspeth, Psy.D., reviewed the file for the state agency and concurred in the earlier opinion of Dr. Havens. Dr. George Andrews did the same with respect to Dr. Dow's opinion on January 7, 2013. R. 446-448.

Plaintiff made her March 2013 appointment, blaming her recent absences on having to take care of her nephew. R. 490. She said she was taking her medication "more regularly now." R. 490. She was also cutting back on her drinking during the week while watching her nephew. R. 492. Physical exam was essentially normal and plaintiff had no complaints other than fatigue. R. 490, 492. She missed her next appointment. R. 487. In May 2013, she was involved in a car accident and

injured her left ankle; there was no fracture or dislocation. R. 687.

In June of 2013, plaintiff stated that she was taking her medication regularly and was feeling well. R. 482. She did report some weakness and fatigue with methadone treatments, and decreased appetite. R. 482. She was still drinking. R. 482. Physical exam was essentially normal aside from joint pain in plaintiff's left foot; she had strained it in her recent car accident. R. 483. Plaintiff said she was very stressed, as she was living with her mother and wanted to move out. R. 483.

In mid-August of 2013, plaintiff sought treatment after 4 days of nausea and diarrhea, and being unable to keep food or water down. R. 572, 477-479. She was hospitalized for 2 weeks. R. 477. She admitted that she had used cocaine the day before, and had last drank alcohol 5 days earlier. R. 572. She explained that she had drank "her typical 10 beers" and experienced several days of vomiting and generalized body aches. R. 595. Plaintiff also related that, over the previous 5 years, she regularly consumed 4 to 5 24-ounce beers a day. R. 573. The attending physician noted that plaintiff had been showing up for appointments only intermittently, and missing 2-3 medication doses a week. R. 533. The doctor also noted that the medication had been effective for viral suppression when plaintiff had been compliant. R. 533.

In addition, plaintiff complained of shortness of breath. R. 681. On August 16, 2013, an echocardiogram showed low normal left ventricular function, and 50-55% ejection fraction. R. 599. Spine x-rays on August 16, 2013, were normal. R. 684. A chest CT on August 19, 2013, showed several pleural effusions. R. 678. The attending physician noted that plaintiff had been non-compliant with her HIV medication regimen. R. 582. Plaintiff exhibited impaired muscle performance and aerobic capacity due to deconditioning. R. 596. On August 24, 2013, chest x-ray was suggestive of pneumonia. R. 686. Liver functions studies were also abnormal at that time and

an ultrasound revealed plaintiff's liver was fatty. R. 676. Pleural effusions had decreased by August 25th. R. 672.

In September 2013, plaintiff sought treatment for severe pain in her right hip. R. 669. She admitted some non-compliance with her antibiotics regimen. R. 591. On September 13, 2013, there was full range of motion in the right hip, full strength, and pain was minimal. R. 592. On September 24, 2012, the attending physician at the clinic again reported that plaintiff was missing too many doses of her HIV medication. Plaintiff explained that this was because she was "all over the place with housing." R. 518.

On November 5, 2013, Dr. Susan Bleasdale, who had been treating plaintiff every 3-4 months at the clinic, filled out a form for plaintiff's attorney. She noted that her diagnoses were HIV and hepatitis C and that prognosis was guarded. R. 456. She reported that plaintiff was not on treatment because of alcohol abuse. R. 456. She also reported that plaintiff suffered from depression. R. 457. Dr. Bleasdale felt that plaintiff could only walk 1-2 city blocks without rest, sit or stand for no more than 10 minutes at a time. R. 457. Plaintiff could only sit or stand or walk for a total of less than 2 hours in an 8-hour day with breaks. R. 457. Dr. Bleasdale felt that plaintiff could not work for any time at all during the course of a week. R. 457. Pain and fatigue would require plaintiff to take 10 breaks during a workday. R. 458. She could only lift less than 10 pounds occasionally, and had almost no use of her hands and arms in terms of reaching and manipulating objects. R. 458. Plaintiff would be off task more than 25% of each day and was incapable of even low-stress work. R. 459. Dr. Bleasdale concluded that, given plaintiff's history of substance abuse and depression, she would not be able to work a regular job. R. 459.

### III. THE ADMINISTRATIVE HEARING

At her administrative hearing, the plaintiff testified that she had not worked in about 20 years. R. 57. Fatigue was her major issue and had been for about 10 years. R. 59. She would become fatigued when she tried to clean or walk 2 blocks to the store. R. 59-60. She slept only 5 hours a night, but also napped during the day. R. 60. She had nightmares she traced to being raped 10 years ago. R. 69. Plaintiff claimed that she experienced significant weight loss over the previous 2 years. R. 61. She said she weighed 140 pounds at the time of the hearing, but her weight went up and down. R. 61. She claimed she vomited about every other day due to her medications. R. 62.

Plaintiff testified that her concentration was not good at all, and that she would forget what she was supposed to buy at the store if she did not have it written down. R. 63. Plaintiff lived with her mother and tried to help around the house. R. 64. She could mop or do dishes, but her mother cooked and did the laundry. R. 64. Plaintiff said she would get tired after 5 or 10 minutes of housework. R. 58. She related that for a time, she babysat her 2-year-old nephew, but had to stop due to her fatigue. R. 72.

Plaintiff testified that she was tired in mornings and had no appetite for breakfast. R. 64. She spent most of each day lying down and watching TV. R. 65. She was still drinking three times a week, consuming a six-pack of beer each time. R. 66. Plaintiff said she drank because she was depressed. R. 67. She explained that she went in for methadone once a week and was tested once a month. R. 73. Plaintiff testified that she had "about 14 clean drops." R. 73.

The vocational expert ("VE") testified thereafter, responding to a number of hypotheticals from the ALJ. First, the ALJ asked the VE whether there were any jobs a person could do if they could lift and carry 10 pounds occasionally and less than 10 pounds frequently; could stand or walk for 2 hours in an 8-hour day, and sit for 6 hours; could occasionally climb ladders, ropes, scaffolds,

stairs, and ramps; and could occasionally stoop, crouch, kneel, and crawl. The VE testified that such

a person could be a document preparer (11,000 jobs in Illinois), an addresser (1400 jobs), or a

telephone quotation clerk (1600 jobs). R. 78. The VE explained that she drew the numbers from

"SkillTRAN", a computerized job bank based on Department of Labor statistics. R. 78.

> The ALJ then added some additional restrictions:
>
> the individual would be moderately limited in the ability to maintain concentration, persistence, or pace. That's just an introductory comment. And as a functional matter, therefore, the individual would be limited to performing simple, routine, repetitive tasks, involving brief superficial interaction with the public, co-workers, and supervisors, and only minor changes in routine work environment.

R. 79. The VE said that these additional restrictions would eliminate the telephone quotation clerk

position, but would still allow the individual to do the document preparer and addresser jobs, as well

as the job of circuit board assembler (3800 jobs in Illinois). R. 79. If the individual were also off task

more than 20 percent of the day due to fatigue, pain, or nausea, the VE said there would be no jobs

they could perform. R. 80. Anything in excess of 15 percent would not be tolerated. R. 80. The VE

added that her testimony was not inconsistent with the Dictionary of Occupational Titles. R. 80-81.

### IV. THE ALJ'S DECISION

As already noted, the ALJ found that plaintiff was not disabled and, therefore, not entitled

to SSI. The ALJ determined that, despite a number of severe impairments – HIV/AIDS, hepatitis

C, post-traumatic stress disorder, affective disorder, opiate dependence in remission, and alcohol

abuse – the plaintiff retained the residual functional capacity ("RFC") to perform a very limited

range of sedentary work. R. 33, 36. The limitation to sedentary work meant that plaintiff could sit

for approximately six hours of an eight-hour workday, walk or stand for no more than about two

hours of an eight-hour workday, and lift or carry less than 10 pounds frequently and 10 pounds

occasionally. R. 36; 20 C.F.R. §416.967(a); *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995). In addition to those restrictions, the ALJ found that plaintiff could occasionally climb ladders, ropes, scaffolding, stairs, or ramps; could occasionally stoop, crouch, kneel, or crawl. R. 36. The ALJ further found that, due to moderate limitations in plaintiff's ability to maintain concentration, persistence, or pace, plaintiff was limited to performing simple, routine, repetitive tasks; and to only brief and superficial interaction with the public, co-workers, and supervisors, and only minor changes in the work environment. R. 36. In reaching this determination, the ALJ accorded great weight to the opinions of the doctors who reviewed plaintiff's medical file for the state disability agency, and rejected the opinion of plaintiff's treating doctor. R. 42-44. Despite all plaintiff's limitations, the ALJ – relying on the vocational expert's testimony – concluded that plaintiff's RFC allowed her to do jobs like document preparer, addresser, or circuit board assembler. R. 45.

## DISCUSSION

## I. STANDARD OF REVIEW

The ALJ's decision must be upheld if it follows the administrative procedure for determining whether the plaintiff is disabled as set forth in the Act, if it is supported by substantial evidence, and if it is free of legal error. 20 C.F.R. §§ 404.1520(a), 416.920(a); 42 U.S.C. § 1383(c). This Court must reverse if there is an error of law, even if the evidence adequately supports the conclusion. *Schmoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless build a "logical bridge" between the evidence and his conclusion. *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). A "minimal [ ] articulat[ion]" of the ALJ's justification is enough. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).

## II. ANALYSIS

Plaintiff has a few issues with the ALJ's decision, but her main complaints regard the ALJ's determination that her complaints were not believable and the ALJ's rejection of the opinion from her treating physician, Dr. Bleasdale. These two points are interrelated, but the ALJ's rejection of plaintiff's allegations will be addressed first.[2]

## A. The ALJ improperly assessed the plaintiff's allegations

In the main, the ALJ rejected the plaintiff's allegations regarding her symptoms and limitations because they were "not fully supported by the medical records . . . ." R. 41. However, the Seventh Circuit has repeatedly criticized ALJs for relying too heavily on the medical evidence when rejecting a claimant's complaints. *Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016); *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014). In this instance, the plaintiff's principal complaint is fatigue. She claims she tires easily and is tired almost all the time. She complains of nausea and vomiting. These are common symptoms of HIV/AIDS, *see Bragdon v. Abbott*, 524 U.S. 624, 636 (1998), and there is no dispute that the medical record establishes that plaintiff is suffering from this syndrome, among other maladies. Moreover, plaintiff was fairly consistent with complaints about fatigue throughout her treatment, R. 205, 216, 234, 269, 353, 461, 482, 490, as the ALJ acknowledged at the hearing. R. 59. Her complaints about nausea are far less frequent, but they are there. So, it is unclear what more the ALJ expected the record to show him in order to support plaintiff's complaints.

---

[2] Since the ALJ issued his decision in plaintiff's case, the Social Security Administration has issued new guidance on how an ALJ is to assess claimants' claims regarding their limitations. *See* SSR 16-3p, 2016 WL 1119029 (effective March 16, 2016), superseding SSR 96-7p. The new ruling eliminates the term "credibility" from its sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p, at *1. "While [this] new policy statement does apply to matters on appeal, the Court is also bound by case law concerning the same regulatory process under the 'credibility' analysis of former SSR 96-7p." *Farrar v. Colvin*, No. 14 C 6319, 2016 WL 3538827, at *5 n.3 (N.D. Ill. June 29, 2016).

It would seem that, in terms of the medical record, the ALJ was more concerned with plaintiff's failures to stay on her medication regimen and follow through with appointments. R. 41. "[W]hile infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding, an ALJ must not draw any inferences about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care . . . ." *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009); *see also Roddy v. Astrue*, 705 F.3d 631, 638–39 (7th Cir. 2013): *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009). Here, the ALJ did not ask plaintiff about her missing appointments or skipping doses of medication. R. 56-68, 74-75. Instead, in his decision, the ALJ focused on plaintiff's alcohol abuse as the dominant reason for her failure to adhere to her prescribed course of treatment. R. 41.

The ALJ cited 3 instances over the course of 2 years where doctors said plaintiff's alcohol abuse as an issue in her HIV treatment. R. 41, 334, 450, 503. Certainly, it has been a problem, but according to the record, not the only one. Plaintiff's course of treatment has been complicated by her heroin addiction recovery, as her participation in a methadone program has limited her HIV/AIDS treatment options. As a result, the prescribed medication regimen was "not . . . totally ideal . . . ." R. 421. In terms of non-compliance, other factors have included transportation issues, babysitting her nephew, homelessness, forgetfulness, and side effects from medication such as nausea. R. 281, 283, 286, 299, 433, 450, 502, 518. Repeatedly, doctors indicated that she simply had poor insight into the seriousness of her condition. R. 511, 518. At other times, plaintiff's entitlements to subsidized or free medication expired or she had made errors in the application process. R. 294, 306. The ALJ did not explore any of these factors in what appears to be, from the record, a rather complex web. *See Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)("[A]n ALJ

may need to question the individual at the administrative proceeding to determine whether there are good reasons the individual did not seek medical treatment or fully comply with prescribed treatment.")  Alcohol abuse was definitely one aspect of plaintiff's sporadic adherence to treatment, but not the only one.

That being said, the ALJ's treatment of plaintiff's alcoholism is somewhat confusing. Under 42 U.S.C. §423(d)(2)(C), an "individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." Ordinarily, "[w]hen an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the [ALJ] is whether, were the applicant not a substance abuser, she would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006).

Here, as the ALJ attributed all of plaintiff's non-compliance issues with her abuse of alcohol and found it to be a severe impairment, he clearly felt is was a serious problem. Indeed, it was serious enough in the ALJ's eyes that plaintiff would continue her abuse of alcohol even though it meant her HIV/AIDS would go unchecked and her condition would deteriorate. But rather than go through the analysis of whether the plaintiff would be disabled if she ceased her substance abuse, the ALJ determined that she was a substance abuser who could still work despite her substance abuse, specifically saying that he accommodated her alcohol dependence in his RFC determination. R. 41. So, following this line of reasoning, the ALJ concluded that plaintiff could drink between 40 and 120 ounces of beer every day, R. 66, 214, 573, 595, to the extent that she couldn't remember her medication or make it to appointments, but she could still hold down a full-time job as a circuit board assembler, document preparer, or addresser.

The ALJ also used plaintiff's alcohol abuse to call into question her allegations of depression. The ALJ noted that plaintiff consistently stated that she drank because she was depressed but he felt it was more likely that her drinking was a factor leading to her depression. R. 41. The Seventh Circuit often criticizes ALJs for "playing doctor", *O'Connor–Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016); *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015); *Engstrand v. Colvin*, 788 F.3d 655, 660–61 (7th Cir. 2015), and the role is especially challenging in cases dealing with mental illness, which is commonly misunderstood. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir.2010). While it is possible that plaintiff's alcohol use triggered her symptoms, but the ALJ was merely speculating and that's not a valid basis for rejecting testimony.

The other issue the ALJ had with plaintiff's complaints was what he felt were inconsistent statements, R. 42, but that doesn't hold up to much scrutiny. He specifically noted that plaintiff testified that her weight went up and down, then debunked that claim by stating that the medical record showed that her weight was "fairly steady" and there was no evidence of "significant weight loss or gain." R. 42. While the ALJ was able to cite some evidence of this, he completely ignored the fact that, in the few months before plaintiff testified at her hearing, the record shows that she lost 40 pounds in just 2 months, going from 174 pounds on June 24, 2013, R. 485, to 135 pounds on August 15, 2013. R. 552.

The ALJ also found fault with plaintiff's claim, at her hearing, that she had 14 clean drug tests at her methadone clinic and had not had a heroin relapse for a year. R.42, 67. To undermine this testimony, the ALJ cited to the clinic's toxicology screen report, which he described as being illegible in terms of dates. R. 42. One has to wonder, then, how it was useful in undermining the

14

plaintiff's testimony. But, in any event, the dates on the report, while darkened, indicate tests conducted about once a month from January 2013 to January 2014. R. 694. There is a single positive test for opiates, in January 2013, R. 694, which would support, rather than undermine, plaintiff's assertion that she last had a heroin relapse a year before her hearing. R. 67. The record shows 10 clean tests over the course of 2013 – there are 2 cocaine positives in addition to the January 2013 test, which was positive for heroin and cocaine – and plaintiff entered the program in July of 2012. R. 693-694. She certainly could have had an additional 4 clean tests from July 2012 through January 2013. She didn't claim she had 14 in a row. If she were determined to lie about her heroin use, she wouldn't have testified to four heroin relapses in 3 years. R. 72.

In sum, in assessing plaintiff's allegations, the ALJ relied too heavily on recitation of the medical evidence, and did not sufficiently explain why that evidence failed to support plaintiff's claims of disabling fatigue from HIV/AIDS. The ALJ's other reasons for rejecting plaintiff's claims – failing to adhere to treatment and inconsistent statements – are similarly unconvincing. Thus, this case must be remanded. On remand, the ALJ must bear in mind the dictates of SSR 16-3p, and not stray into the area of "character" when assessing plaintiff's claims about her symptoms and limitations.

### B. The ALJ failed to adequately support his rejection of Dr. Bleasdale's opinion

As already noted, the ALJ's assessment of plaintiff's allegations is tied to plaintiff's other main criticism of the ALJ's decision: his rejection of her treating physician's opinion that she was disabled. Dr. Bleasdale, as previously discussed, opined that plaintiff was severely restricted in a number of areas, and that she would be unable to hold down a job. R. 457-459. The ALJ rejected Dr. Bleasdale's opinion, saying it was not well-supported by clinical and laboratory diagnostic

techniques and was not consistent with the substantial evidence of record. R. 43. The ALJ went on to explain that Dr. Bleasdale "saw the claimant only a handful of times since the application date" and:

> [g]iven that the opinion is unsupported by the substantial evidence of record which shows non-compliance with treatment, non-compliance with prescribed medication, failure to follow up treatment recommendations, and alcohol abuse, it raises the prospect that Dr. Bleasdale relied quite heavily on the claimant's subjective reports of symptoms and limitations and uncritically accept [sic] as true most, if not all, of what the claimant reported.

R. 43. The ALJ then reiterated the fact that there were a number of reasons he did not believe the plaintiff's allegations.

As can be seen, the ALJ's main reason for disregarding the opinion from plaintiff's treating physician was, again, the ALJ's rejection of plaintiff's allegations. Because the reasons the ALJ gave for disbelieving the plaintiff's allegations didn't hold water, neither does his rejection of Dr. Bleasdale's opinion. *See Engstrand v. Colvin*, 788 F.3d 655, 662 (7th Cir. 2015)(". . . the ALJ's flawed credibility finding hindered her ability to appropriately weigh other favorable evidence, including [the treating physician's] opinion."). Moreover, the Seventh Circuit has pointed out that, when an ALJ rejects a physician's opinion because it relies on a claimant's subjective statements, the ALJ is, again, focusing too narrowly on objective evidence. *Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015). "The logic of [rejecting a physician's opinion on this basis] is that *nothing* an applicant says should be believed; disability determinations should be based entirely on the results of medical tests. Such a rule would flout the Social Security Administration's regulation that [an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.]" 778 F.3d at 687.

Beyond that, it's not clear what "clinical and laboratory diagnostic techniques" the ALJ was looking for. The record contains pages of lab studies confirming consistently low CD4 counts. R. 285, 300, 335, 534. As for Dr. Bleasdale seeing plaintiff "only a handful of times", she did at least see plaintiff those times, not to mention following plaintiff's course of treatment at the clinic. It is odd for the ALJ to criticize this while, at the same time, assigning "great weight" to the opinions of physicians who *never* saw plaintiff. R. 42-43. As the treating physician, Dr. Bleasdale's opinion should have controlled over the conclusions of the agency doctors who did not examine plaintiff, unless the ALJ could persuasively explain why Dr. Bleasdale's opinions about plaintiff's serious limitations were not supported by the record. *Engstrand*, 788 F.3d at 662. As already noted, the ALJ failed to do that here, basing his determination on Dr. Bleasdale's acceptance of plaintiff's complaints and a lack of unspecified "clinical and laboratory diagnostic techniques."

It certainly strains logic to favor doctors who have never seen plaintiff over one who has treated her regularly, while at the same time rejecting the opinion of that treating doctor for not seeing the plaintiff enough. But, here, there is the additional problem of the physicians' specialties. One of the reviewing physicians, Dr. Dow, is an osteopath, and the other, Dr. Andrews, is a general practitioner. R. 409, 448. Dr. Bleasdale, meanwhile, is a specialist in the area of infectious diseases, particularly HIV. http://chicago.medicine.uic.edu/departments programs/departments/medicine/ infectious_diseases/faculty/susan_c bleasdale m_d/. This would certainly seem to imbue her opinion with greater weight than those of Drs. Dow and Andrews, *see Thomas v. Colvin*, 826 F.3d 953, 959 (7th Cir. 2016); *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014), but the ALJ ignored this factor.

**CONCLUSION**

For the reasons discussed more fully above, we remand this matter for further proceedings consistent with this opinion. Plaintiff's motion for summary judgment [dkt. 14] is granted, and the Commissioner's motion [dkt. 21] is denied.

**ENTER:**
**DATED:**
**12/14/16**

_____
Susan E. Cox, U.S. Magistrate Judge